UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Alexis Robinson, | ) |
| Plaintiff, | ) Civil Action No.:_____ |
| vs. | ) **COMPLAINT** |
| | ) (Jury Trial Demanded) |
| Medical University of South Carolina, | ) |
| Defendant. | ) |

Plaintiff, complaining of Defendant, herein alleges that:

## PARTIES AND JURISDICTION

1. This action is brought pursuant to the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981(c), as amended by the Civil Rights Act of 1991 ("Section 1981") for race discrimination and retaliation.

2. Plaintiff is a citizen and resident of the Florence County, South Carolina.

3. At all relevant times, Alexis Robinson ("Plaintiff" or "Ms. Robinson") was an employee of the Medical University of South Carolina-Florence. ("Defendant" or "MUSC").

4. Defendant is a corporation organized and existing under the laws of South Carolina, which does business and has a facility in Florence, South Carolina, which is located in Florence County.

5. This Court has original jurisdiction over Plaintiff's Section 1981 claims pursuant to pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) because Defendant does business in this judicial district and division and the unlawful employment

1

practices giving rise to Plaintiff's claims were committed within this judicial district and division.

## FACTUAL ALLEGATIONS

7. Plaintiff was hired as a physical therapist for MUSC and began her employment on or about March 4, 2019. She began her employment working on the fifth floor.

8. At all times relevant to this Complaint, the Plaintiff met or exceeded all performance expectations of her job.

9. When Plaintiff was hired none of her supervisors or any of the people she reported to were African American. When she began she reported to Ronald Mandane ("Mandane"), an Asian American, who was Robinson's manager on the fifth floor.

10. On November 20, 2019, Wendy Davis ("Davis") (Caucasian), the Joint Program Coordinator for MUSC, offered Ms. Robinson a promotion to the lead physical therapist for the fourth floor. However, Davis questioned if Ms. Robinson was available for the promotion because Mandane, an Asian American stated that Ms. Robinson was unavailable.

11. Later in the day, November 20, 2019, Mandane expressly told Ms. Robinson that he "would not approve" Ms. Robinson's promotion to the fourth floor, thus keeping Ms. Robinson on the fifth floor.

12. The fifth floor is predominantly staffed with African American healthcare providers and is often referenced as the "difficult floor" by Mandane, Ava Guevarra ("Guevarra"), and Adelaida Lucena ("Lucena"), all of whom are Asian Americans employees.

13. On November 25, 2019, Ms. Robinson met with Mandane to discuss her annual review. Mandane informed Ms. Robinson that there were complaints regarding when she reported to work and complaints of her illness related absences.

14. Prior to this annual review, Ms. Robinson was never made aware of any complaints made against her. Ms. Robinson elected not to sign her annual review report. A poor annual review would impact Ms. Robinson's promotion to the fourth floor and her pay.

15. Ms. Robinson requested a joint meeting with Roxie Smallwood ("Smallwood"), (Caucasian), the Director for the Rehabilitation Department at MUSC, and Mandane. Ms. Robinson complained of the difference in the way she was being treated than her non-African American co-workers. Afterwards, Ms. Robinson was threatened by non-African American co-workers, "We do not tell Roxie [Smallwood] what goes on here."

16. On November 26, 2019, Ms. Robinson met with Kay Douglas ("Douglas"), (Caucasian) the Human Resources Director for MUSC, regarding the impact of an annual review and MUSC's position transfer policy. She again complained about being treated different from her non-African American co-workers. Douglas told Ms. Robinson that her issues needed to be discussed with Smallwood instead. Ms. Robinson continued to get the run-around regarding her complaints.

17. On November 27, 2019, Ms. Robinson met with Smallwood to discuss her fourth-floor promotion offer. Smallwood informed Ms. Robinson that she would speak with Davis regarding Ms. Robinson's promotion. Smallwood assured Ms. Robinson that her annual review was not bad, and Ms. Robinson's signature was needed on the report.

3

18.     On December 2, 2019, Ms. Robinson met with Smallwood and Mandane. During this meeting Ms. Robinson signed her annual review report but expressed that she did not agree with some of the statements. Again, Smallwood assured Ms. Robinson that her annual review report was not bad, and Ms. Robinson's signature was needed on the report. Further, Smallwood confirmed that Ms. Robinson was going to be promoted to the fourth floor. Therefore, Ms. Robinson asked Mandane to be able to shadow Joe Frasier ("Frasier"), (Caucasian) and the current fourth floor physical therapist, in preparation for her new role. However, Mandane denied Ms. Robinson's request.

19.     On December 5, 2019, Ms. Robinson was summoned to attend an unscheduled meeting with Mandane, Smallwood, Davis, and William Brandon Hooks ("Hooks") (Caucasian). Hooks was to be Ms. Robinson's manager for the fourth floor. During this meeting, Ms. Robinson's supervisors informed her of their expectations for the lead fourth floor physical therapist.

20.     While comprehending the extensive expectations, Ms. Robinson observed that the former lead fourth floor physical therapists, Frasier and Rebecca Young ("Young"), both Caucasian, did not have the same job responsibilities as her. For example, Ms. Robinson was required to report to four managers (Mandane, Smallwood, Davis, and Hooks), as opposed to Frasier and Young, who only reported to Smallwood and Mandane.

21.     On December 9, 2019, Ms. Robinson officially started her role as the lead fourth floor physical therapist. However, Ms. Robinson was ostracized by her peers who were non-African Americans.

22. On December 11, 2019, Mandane led a huddle meeting and announced that Ms. Robinson would now be the supervisor for physical therapists on the fourth and fifth floors. Following this announcement, Guevarra (Asian American) stood up from her seat, slammed her hands on her computer, and exclaimed "There is no way I would take orders from her [Ms. Robinson]! No, I just won't help on those floors! You [Ms. Robinson] can have it!"

23. Then, Lucena (Asian American) stood up from her desk across the room, and threateningly approached Ms. Robinson. The entire time that Lucena was approaching Ms. Robinson, Ms. Robinson remained seated and composed. From behind the human barrier of Mandane, Lucena yelled at Ms. Robinson "Who the hell do you think you are!? You can't just come in here and take over! We had plans for that floor! You just don't get to go behind our backs without checking with us first!"

24. On December 13, 2019, Smallwood met with Ms. Robinson for a private meeting. Ms. Robinson requested Lucena and Guevarra receive a disciplinary notice for their behavior at the December 11, 2019, huddle meeting. Yet, Smallwood took no actions. She again complained of being treated worse than her non-African American co-workers.

25. On December 23, 2019, Ms. Robinson requested a substitute rehabilitation assistant. Unlike Frasier and Young, who were able to receive substitute rehabilitation assistants, Mandane denied Ms. Robinson's request.

26. On or about February 4, 2020, Ms. Robinson was assigned "Patient C". Patient C is the relative of the Chief Nursing Officer for MUSC, Costa King Cockfield, who is also Caucasian. Ms. Robinson was instructed by Hooks and family members of Patient

C to perform physical therapy on Patient C daily. Family members of Patient C threatened Ms. Robinson that if she did not perform physical therapy on Patient C daily, it would be "her job". However, Ms. Robinson elected not to perform physical therapy on Patient C, based on her clinical judgment that Patient C was too ill.  Ms. Robinson informed Smallwood of the threats she received from Patient C's family, yet Smallwood took no actions. Further, Patient C's doctor, Dr. Bolduc, confirmed that the patient was indeed too sick for physical therapy.

27.     On February 7, 2020, Hooks (Caucasian) threatened to file a report against Ms. Robinson as non-compliant for not performing physical therapy on Patient C daily. Additionally, Hooks and Smallwood threatened to terminate Ms. Robinson if she did not remove all the patients from their beds daily. However, this instruction from Hooks and Smallwood, was not MUSC's policy.

28.     On or about February 14, 2020, Ms. Robinson was being required to working overtime when she was the lead physical therapist, while Frasier and Young were not expected to work overtime when they were the lead physical therapists for the fourth floor.

29.     On March 5, 2020, Ms. Robinson noticed that a patient had an alarming blood pressure level. Ms. Robinson informed Nurse Beth (Caucasian), of her observation. However, Nurse Beth placed her hand in Ms. Robinson's face and exclaimed at her, "Quiet!" Ms. Robinson pointed at Nurse Beth and stated, "You are never to speak to me like that again, and clinically you need to go check on the patient right now." Ms. Robinson informed Smallwood of Nurse Beth's volatile behavior. Yet, Smallwood never addressed the issue.

30. On March 11, 2020, Ms. Robinson contacted the Employee Relations Consultant for MUSC-Charleston, Rachel Foster ("Foster"), to inquire about MUSC's discrimination policy. Foster responded by instructing Ms. Robinson to copy her on any email with Douglas, should Douglas not resolve the reported issue.

31. Later, during the day of March 11, 2020, Hooks, Davis, Mandane, and Smallwood had a meeting with Ms. Robinson. All the present managers gave Ms. Robinson conflicting instructions, and multiple chains of command to report to, unlike Frasier and Young. Towards the end of this meeting, Hooks and all of Ms. Robinson's supervisors jeered at the amount of instruction that they gave to Ms. Robinson. Hooks mockingly said, "Oh you just wait! Things are about to get a lot busier around here!"

32. During the months of April and May of 2020, Ms. Robinson began to receive an increased amount of management from Guevarra, who was Ms. Robinson's own report. Some examples of how Guevarra regulated Ms. Robinson included but was not limited to, an unstable work schedule and day-to-day instructions. Frasier and Young, were not subjected to direction from peers at their level. Additionally, Ms. Robinson previously reported Guevarra to MUSC's Human Resources Department.

33. On August 26, 2020, Ms. Robinson met with Douglas to again report incidents of racial discrimination. Specifically, Ms. Robinson reported that her schedule was changing daily, whereas Frasier and Young maintained stable work schedules. However, Douglas stated that there was not racial discrimination taking place because there was an African American occupational therapist who did not experience the same issues as Ms. Robinson.

34. On September 4, 2020, Ms. Robinson emailed Smallwood and copied Douglas discussing how Smallwood instructed her not to work over forty hours a week but then gave her assignments that required her to work over forty hours a week to complete. This suspiciously conflicting instruction resulted in Ms. Robinson having a pay loss because Ms. Robinson would be required to go home and not receive new assignments. Smallwood told Ms. Robinson she should follow up with Mandane regarding this issue.

35. On September 23, 2020, a joint meeting was held with Ms. Robinson, Mandane, Douglas, and Smallwood, discussing Ms. Robinson's previously reported fluctuating schedule. However, the meeting quickly turned into Ms. Robinson's colleagues belittling her. Smallwood and Mandane stated that Ms. Robinson would continue to have a fluctuating schedule, and Douglas shouted at Ms. Robinson "You will do what they say!" Following this meeting, Douglas physically cornered Ms. Robinson and told her "Go along with it. I will handle this; I have been doing this for a long time."

36. On October 1, 2020, Ms. Robinson was working on the fourth floor by herself and noticed that her back was sore after she performed physical therapy on a patient. That evening, Ms. Robinson informed MUSC that she would not be able to attend work the next day. She also had to miss work due to pain on October 4, 2020. She had to be taken to the Emergency Room by EMS on October 4, 2020. On October 13, 2020, Dr. Miranda ordered an MRI.

37. On October 23, 2020, the physicians at MUSC performed an MRI on Ms. Robinson and diagnosed Ms. Robinson with a herniated disc. Ms. Robinson was

approved for medical leave under the Family and Medical Leave Act (FMLA) from October 2, 2020, to December 24, 2020.

38. On November 16, 2020, Ms. Robinson had back surgery.

39. On December 21, 2020, Ms. Robinson returned to work at MUSC. Ms. Robinson was removed from the fourth floor and replaced by the former lead fourth floor physical therapist, Young (Caucasian). Young at the time was only an independent contractor with MUSC, not a full-time employee. Ms. Robinson was then left as the lead fifth floor physical therapist, the "problem floor".

40. On December 23, 2020, Ms. Robinson requested to have Douglas present for her annual review meeting with Smallwood. Ms. Douglas responded later that she was at another site, but she would be glad to schedule to meet another time.

41. On December 25, 2020, Ms. Robinson injured her back again while working at MUSC, and was taken to MUSC's emergency department for care. MUSC's physicians ordered Ms. Robinson out of work until December 28, 2020.

42. On December 28, 2020, Ms. Robinson returned to work at MUSC and learned that fifth floor was closed and the patients that Ms. Robinson was currently treating were moved to the fourth floor.

43. On December 29, 2020, LeBron-Cooper instructed Ms. Robinson not to come to the fourth floor under any circumstances, despite Ms. Robinson's patients being housed on the fourth floor. Ms. Robinson was told that she would have to work on the seventh and eighth floors and be supervised by Lucena and Guevarra, the physical therapists who Ms. Robinson had previously reported to MUSC's Human Resources Department.

44.     On January 7, 2021, Ms. Robinson was working on the seventh floor and injured her back for the third time while moving a patient.

45.     On January 8, 2021, Ms. Robinson visited MUSC's emergency department for her injury. The nurse practitioner recommended that Ms. Robinson visit her neurologist instead of waiting for the worker's compensation doctor's evaluation.

46.     On January 12, 2021, Ms. Robinson returned to work requesting accommodations for but not limited to: not being allowed to lift more than twenty (20) pounds for four weeks; a need for a back brace (purchased by Ms. Robinson); use of a patient lift (readily available at MUSC) when lifting more than fifty pounds; and the assistance of an on staff rehabilitation assistant when needed. Ms. Robinson attempted to have MUSC's Human Resources Department approve her accommodations, but Douglas stated that MUSC could not accommodate Ms. Robinson'.

47.     Later on January 12, 2021, Destiny Brown, (Caucasian) from MUSC's Human Resources Department informed Ms. Robinson that Smallwood and LeBron-Cooper could not accommodate Ms. Robinson's medical needs. Therefore, Brown instructed Ms. Robinson to request for FMLA leave, and not return to work MUSC.

48.     However, Terri Hall "Hall" (Caucasian) received accommodations for back and wrist injuries such as not lifting patients that would strain her injuries and being allowed to wear a back brace. Additionally, Eve Cook "Hook" (Caucasian) who has Parkinson's Disease received an assistant for lifting patients and work half days. Several other non-African American PA's also had partners that worked with them, which made it easier to do their jobs, especially lifting patients. Ms. Robinson could have been allowed

10

the use of a rehab aide or the use of a transfer lift which the hospital had, but she was not offered these options.

49. On January 15, 2021, Ms. Robinson requested a copy of MUSC's ADA policy. Ms. Robinson hoped to complete the required documents for a brief leave of absence to be considered a reasonable accommodation for a disability. Instead, Douglas told Ms. Robinson to request a "personal leave of absence." Then MUSC denied Ms. Robinson's request for a personal leave of absence. Ms. Robinson again requested the information for how to request a reasonable accommodation for her disability from MUSC, but Douglas did not respond.

50. On January 25, 2021, Douglas and Ms. Robinson met. At this meeting, Douglas indicated that Ms. Robinson was going to be terminated. Douglas also gave Ms. Robinson the required ADA forms for requesting a reasonable accommodation for a disability. However, Douglas only gave Ms. Robinson three business days to fill out the forms and obtain a physician's signature. Ms. Robinson could not get in to see her doctor in that time, but was able to very shortly thereafter to no avail.

51. On January 29, 2021, after Ms. Robinson was unable to obtain the requisite information for the ADA accommodation forms, MUSC terminated Ms. Robinson. MUSC claims they could not accommodate Ms. Robinson's medical restriction (no lifting over twenty pounds) and could not approve her personal leave of absence. However, Ms. Robinson could do her job with the accommodation of being able to wear a back brace. With such she could lift up to 50 lbs.

52. The denial of Ms. Robinson's request for an accommodation was discriminatory because similarly situated white employees were given accommodations

and were provided assistance to be able to do their jobs. Had Ms. Robinson been treated the same as white and non-African American employees she would have been able to continue her job.

53. Ms. Robinson experienced discrimination and a hostile work environment from the time she began with MUSC because of her race. When Ms. Robinson complained of race discrimination, MUSC's treatment of Ms. Robinson worsened thereby retaliating against Ms. Robinson for exercising her protected right to complain of race discrimination.

54. As further evidence of Ms. Robinson's claims, subsequent to her termination, Ms. Robinson learned that her manager and the individual who refused to accommodate her, William Hooks was terminated for underpaying black employees and assigning them less desired schedules.

**FOR A FIRST CAUSE OF ACTION**
(Discrimination in Violation of Section 1981)

55. Plaintiff re-alleges the allegations contained in Paragraphs 1 through 54 as if repeated verbatim herein.

56. Plaintiff's discrimination agaisnt Plaintiff is in violation of the Civil Rights Act 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

57. By the conduct described above, Defendant deprived Plaintiff the same rights and terms of employment enjoyed by white employees to the creation, performance, enjoyment, and all benefits and privileges, of their contractual employment relationship with MUSC, in violation of 42 U.S.C. § 1981.

58. As a result of the Defendant's discrimination, the Plaintiff was denied employment opportunities providing substantial compensation and benefits, thereby

entitling Plaintiff to injunctive and equitable monetary relief; and has suffered anguish, humiliation, distress, incovenience, and loss of enjoyment of life because of MUSC's actions, thereby entitling her to compensatory damages.

59.     In its discriminatory actions as alleged above, MUSC acted with malice or reckless indifference to the rights of the Plaintiff, thereby entitling her to an award of punitive damages.

60.     To remedy the violations of the rights of Plaintiff secured by Section 1981, Plaintiff requests that the Court award her the releief prayed for below.

## FOR A SECOND CAUSE OF ACTION
(Retaliation in Violation of Section 1981)

61.     Plaintiff re-alleges the allegations contained in Paragraphs 1 through 60 as if repeated verbatim herein.

62.     Plaintiff's retaliation agaisnt Plaintiff is in violation of the Civil Rights Act 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

63.     By the conduct described above, Defendant retaliated against Plaintiff when she made complaints that she was being treated different because of her race. As a result Plaintiff was deprived the same rights and terms of employment enjoyed by white employees to the creation, performance, enjoyment, and all benefits and privileges, of their contractual employment relationship with MUSC, in violation of 42 U.S.C. § 1981.

64.     As a result of the Defendant's retaliation, the Plaintiff was treated worse than employees who did not complaint of race discrimination and she was denied employment opportunities providing substantial compensation and benefits, thereby entitling Plaintiff to injunctive and equitable monetary relief; and has suffered anguish,

humiliation, distress, incovenience, and loss of enjoyment of life because of MUSC's actions, thereby entitling her to compensatory damages.

65. In its retaliatory actions as alleged above, MUSC acted with malice or reckless indifference to the rights of the Plaintiff, thereby entitling her to an award of punitive damages.

66. To remedy the violations of the rights of Plaintiff secured by Section 1981, Plaintiff requests that the Court award her the releief prayed for below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendant to pay equitable monetary relief, compensatory damages, punitive damages, attorney's fees and costs and any other such relief deemed appropriate by this Court.

**MIKE KELLY LAW GROUP**

By: s/Janet E. Rhodes
Janet E. Rhodes, Esquire (Fed. Id. 10521)
1523 Huger Street, Suite A
Post Office Box 8113
Columbia, South Carolina 29202
Telephone: 803-461-2160
Facsimile: 803-252-7145
Email: Jrhodes@mklawgroup.com

ATTORNEY FOR PLAINTIFF

April 6, 2022
Columbia, South Carolina

14